Vicki L. SPINA, Plaintiff,

v.

**MANAGEMENT RECRUITERS OF O'HARE d/b/a Office Mates–5, Defendant.**

No. 86 C 10299.

United States District Court, N.D. Illinois, E.D.

May 24, 1991.

Claudia Oney, Chicago, Ill., for plaintiff.

Irving Geslewitz, Steven A. Kanner, Much, Shelist, Freed, Deneberg, Ament & Eiger, Chicago, Ill., for defendant.

## MEMORANDUM DECISION AND ORDER

ALESIA, District Judge.

This sex and/or pregnancy discrimination case is before the Court for a decision on the merits following a bench trial on the issue of liability only. After hearing testimony, reviewing exhibits, and examining the credible evidence of record, the Court enters judgment in favor of the defendant, Management Recruiters of O'Hare ("MRO"), d/b/a Office Mates-5 ("OM5") (collectively, "the Company"), and against the plaintiff, Vicki L. Spina ("Spina"). Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets forth its findings of fact and conclusions of law.

## FINDINGS OF FACT

As is common in discrimination cases, the parties presented conflicting versions of the relevant facts. We therefore set forth the facts as we find them to be.

*The Parties*

1. Spina is a female who resides in Des Plaines, Illinois.

2. MRO is an Illinois corporation with its principal place of business in Des Plaines, Illinois. MRO is engaged in the business of placing professionals and executives with salaries of $30,000 or more. OM5 is a wholly-owned subsidiary and division of MRO and is engaged in the business of placing secretarial, clerical, and office support personnel with salaries of $20,000 or less.

3. Richard Kurz founded MRO in 1975 when he purchased a franchise from Management Recruiters International. Within a year or two of purchasing the franchise, Richard Kurz established OM5 as an unincorporated division of the business. Shortly thereafter, he married Anita Smilari Kurz, whom he placed in charge of the OM5 division as general manager in 1977.

4. Spina was employed by MRO in its OM5 division as an account executive from October, 1979 to May, 1982, when she voluntarily left the employ of OM5 to give birth to her first child. Spina was reemployed by the OM5 division in March, 1983 and worked there continuously until November 20, 1985.

5. When initially hired in 1979, Spina signed an employment agreement governing certain of her terms and conditions of employment. When hired, all account executives of MRO and OM5 sign identical employment agreements containing, among other terms, the same restrictive covenant language and the same commission structure.

*Differences Between MRO and OM5*

6. Both MRO and OM5 are located in an office suite in Des Plaines, Illinois. The physical layout of the suite is configured such that MRO and OM5 are physically separated offices, sharing only a main entrance staffed by a receptionist. A walled training room separates the OM5 division from the entrance area, and in order to proceed from the entrance area to the OM5 area, one has to pass through two doors. As a result, employees working within the OM5 and MRO offices have no visual access to each other while working in their respective offices.

7. MRO and OM5 are physically separated for legal, as well as operational reasons. Under the Illinois Private Employment Agencies Act, private employment agencies and their recruiters must be licensed and must abide by certain statutory strictures. *See* Ill.Rev.Stat. ch. 111, ¶¶ 901–915. The statutory definition of "private employment agency," however, does not include *executive* placement opera-

tions such as MRO. *See* Ill.Rev.Stat. ch. 111, ¶ 914.

8. The nature of the placement services offered by MRO and OM5 and the qualifications of their respective employees are also different. On the one hand, MRO places executives earning $30,000 or more on a local and nationwide basis. The majority of the candidates seeking placement by MRO hold advanced degrees. As a result, MRO generally hires account executives who hold advanced degrees and have a specialty background, such as accounting, banking, law, etc. Most MRO employees have executive experience. These MRO employees, in turn, use their specialty backgrounds to place candidates in their particular specialty industry. On the average, an MRO account executive requires between six to seven weeks and two months to make a placement, with an average placement fee being over $11,000. Because of their different specialty areas, MRO account executives seldom work with one another to match a candidate with an account.

9. OM5, on the other hand, places secretarial, clerical, and office support personnel earning $20,000 or less strictly on a local basis. In contrast to MRO, the majority of candidates seeking placement by OM5 do not hold advanced degrees. As a result, OM5 generally hires individuals who have a high school education and a secretarial or clerical background. Unlike the MRO account executives, the OM5 account executives have no specialized background, so most of the OM5 placements are made on a split-fee basis, with the account executive who furnishes the candidate earning 50% of the commission and the account executive who obtains the placement order from the client earning the remaining 50%. At OM5, the average elapsed time from the taking of an order to the actual placement of the candidate is less than one week, with the average placement fee (based on a fee schedule different from that used by MRO) being approximately $3,000. Whereas MRO is considered a "search firm," OM5 is registered as a licensed employment agency.

10. As a result of these operational differences and their physical separation, the MRO and OM5 account executives do not share common supervision. Richard Kurz generally supervises the MRO account executives on a day-to-day basis, while Anita Kurz generally supervises the OM5 account executives on a day-to-day basis. Anita Kurz has never supervised MRO personnel nor participated in personnel or policymaking decisions at MRO. In the event Richard Kurz is absent from the office, he appoints a senior MRO account executive to management operations in his stead. Similarly, except for a period in 1981–82 when Anita Kurz left to give birth to the Kurzes' two children, Richard Kurz has not involved himself in the direct day-to-day supervision or operational management of OM5. All personnel decisions and policymaking at OM5 are made by Anita Kurz.

11. The MRO and OM5 account executives have never worked together on accounts. No MRO account executive has ever transferred, either permanently or temporarily, to the OM5 division. Conversely, no OM5 account executive has ever transferred, either permanently or temporarily, to the MRO division. Nor has there ever been any line of progression between the OM5 and MRO positions.

12. As a result of these operational differences, MRO and OM5 each use different stationery and have different telephone numbers. The MRO and OM5 employees also use different business cards, different stationery, different job orders and different send-out forms.

13. MRO and OM5 also are operated as separate profit centers. Each division has a separate budget and advertising outlay. Nevertheless, because the total MRO payroll is relatively small (at all relevant times, the total staff at MRO and OM5, including Richard and Anita Kurz, numbered from twelve to seventeen), Richard Kurz has maintained a single payroll, bank account and profit sharing and health insurance plan for both divisions. Richard Kurz testified that he does so for reasons of administrative convenience and cost savings.

14. Notably, all of Spina's non-party witnesses who were former employees of either MRO and OM5 testified to their perception that the MRO and OM5 divisions are operated as separate divisions.

15. During the periods of Spina's employment with the OM5 division, all OM5 account executives were female, and they numbered between four and eight employees at any given time. On the other hand, MRO account executives were male and female, and they numbered between five and nine employees at any given time. During the course of Spina's employment, MRO employed a total of seven female account executives in the MRO division. All male and female MRO account executives share identical working conditions. The same differences in terms of employment that exist between male MRO account executives and OM5 account executives also exist between female MRO account executives and OM5 account executives.

16. Generally, all employees of MRO and OM5 work a full-time schedule consisting of a 37½ hour, five-day week.

17. All MRO and OM5 employees are paid a minimum draw, which is an advance against future commissions. If commissions earned exceed the minimum draw, an employee receives a check for commissions because he or she does not need a draw. Thus, an employee who performs very well does not receive a draw, but, instead, receives commissions earned.

*Spina's Initial Employment with OM5*

18. In October 1979, Anita Kurz, as manager of OM5, hired Spina as a full-time account executive. Shortly after starting at OM5, Spina became a successful producer. It is undisputed that during most of her tenure at OM5, Spina performed her job excellently, received several awards and plaques for her sales performance, was the top producer in OM5's Des Plaines office, and was one of the top producers nationally.

19. At the end of 1979, Anita Kurz became pregnant with the Kurzes' first child. During the latter stages of her pregnancy, Anita Kurz began experiencing pregnancy-

related health problems and she stopped working in August, 1980. At the time Anita Kurz left, she intended not to come back to work, but to stay at home and raise her child.

20. Before leaving, Anita Kurz chose Spina to act as manager at OM5 in Anita Kurz's absence. Spina continued to act as manager of OM5 on a full-time basis until May, 1982, when Spina voluntarily left OM5's employ to give birth to her first child. Between August, 1980 and May, 1982, Spina assumed most, but not all, of Anita Kurz's responsibilities. At the same time, Spina continued to work as an account executive. To compensate her for her increased responsibilities, Spina's pay arrangement was changed so that she received an override on the dollar volume of the individuals she supervised in addition to the commissions she earned. During the period of Anita Kurz's absence, Spina, as manager of the OM5 division, reported to Richard Kurz. Richard Kurz made all of the hiring and business decisions for the OM5 division in Anita Kurz's absence because of Spina's lack of experience in such matters. The remainder of the account executives in the OM5 division reported to Spina.

21. Between October, 1979 and May, 1982, Spina, like all of the other MRO and OM5 employees, worked a full-time schedule consisting of a 37½-hour, five-day workweek.

22. At the end of 1981, Spina became pregnant with her first child and so informed Richard Kurz. In February, 1982, Spina announced that she did not intend to return to work after she left to have her child, deciding instead to stay home and raise her child. Richard Kurz told Spina that if she changed her mind, he would love to have her back. Anita Kurz, who at that time was herself pregnant with her second child, told Spina that she and Spina "would be mothers together."

23. During the course of her first pregnancy, Spina often had to leave work early or miss days because of doctor's appointments or pregnancy-related illnesses. Spina was always permitted to take whatever absences she needed, and was never admonished for doing so.

24. Spina voluntarily left OM5's employ on amicable terms in May, 1982. Shortly before Spina left, the Company threw a farewell office party for her at its expense, though this was not done for everybody who left the Company. After Spina left, the Kurzes remained in touch with her. The Kurzes invited Spina to the Company picnic in July, 1982, and she came. Anita Kurz also attended Spina's baby shower and bought her a stroller as a gift.

*Spina's Return to OM5*

25. In January, 1983, the OM5 business was failing, and Richard Kurz asked his wife to return to manage it back to health. Reluctantly, Anita Kurz returned to OM5.

26. During the same month, Spina telephoned Richard Kurz and told him that she was interested in returning to work at OM5. Richard Kurz responded favorably, and the two agreed to meet for lunch to discuss the matter. During their meeting, Richard Kurz and Spina agreed that Spina would return as an account executive at OM5. Richard Kurz also mentioned to Spina that because she had left OM5 less than one year before, he thought that she would not lose her vested rights in the Company's profit sharing plan. Richard Kurz further advised Spina that he would arrange to have the 90-day waiting period for health insurance coverage waived so that she could immediately have such coverage. Spina was pleased with these arrangements. Spina also told Richard Kurz that she wanted assurances that she could take time off when necessary to care for her child, and Richard Kurz agreed.

27. In March, 1983, after a ten-month absence, Spina returned to work as a full-time account executive in the OM5 division. Spina again reported directly to Anita Kurz. During her first few weeks, Spina encountered difficulty reacclimating to the business. Anita Kurz offered Spina encouragement, and Spina soon became a top producer again. Spina wrote a note to Anita Kurz thanking her for her encouragement. During the remainder of her

employment, Spina wrote several other such notes to Anita Kurz.

28. Following Spina's return to work, she and Anita Kurz became close personally. They socialized at each other's homes, went on outings together with their children, and exchanged birthday and Christmas gifts. In early 1984, after a fire struck Spina's home, Spina stayed at the Kurzes' home for a brief period. None of the other account executives shared this type of personal relationship with the Kurzes.

*Spina's Request for a Four–Day Workweek*

29. Sometime in June of 1984, Spina initiated a conversation with Anita Kurz in the Company training room. During this conversation, Spina requested that she be compensated in the form of a straight 50% commission plan. Spina said she felt she was entitled to this rate of commission because she was the top producer in the office. In response, Anita Kurz told Spina that Spina was already earning more money than anyone else in the office and refused Spina's request.

30. All of the MRO and OM5 account executives worked under the same commission plan. Under this plan, employees received a 30% commission on the first $3,000 they cashed in each quarter, with a 5% increment for each additional $3,000 until they reached $15,000, after which they received a 50% commission on all subsequent cash-ins.

31. Anita Kurz told Spina that she could not change the commission plan for Spina because Spina was fairly paid and to do so would create resentment among the other account executives. Spina expressed dissatisfaction with this response.

32. Several days later, Spina initiated another conversation with Anita Kurz. This conversation also occurred in the Company training room. During this conversation, Spina asked Anita Kurz if Spina could work a four-day workweek, rather than a five-day workweek. In proposing this alternative, Spina explained that she wished to spend more time with her child. Anita

Kurz told Spina that she would consider the idea.

33. That evening Anita Kurz discussed the matter with her husband. By design, neither MRO nor OM5 had ever employed part-time employees before. In the Kurzes' judgment, the nature of the placement business required that account executives work a full workweek. Based on their experience, candidates and clients wanted immediate attention and tended to seek out other placement services rather than wait for an account executive to return a telephone call. (Spina, by her own admission, agreed with this assessment). To deal with this problem, Anita Kurz had established an office procedure whereby if an account executive was out, either Anita Kurz or another account executive would take the order for the absent account executive.

34. In any event, after considering Spina's proposal to work a four-day, 30–hour workweek, Anita Kurz decided to accommodate Spina and grant her request. Anita Kurz did so because Spina was OM5's top producer, as well as a friend.

35. In order to avoid the appearance of preferential treatment to Spina and to remain fair to the other account executives at OM5, however, Anita Kurz devised a formula whereby any account executive at OM5 could become eligible for a four-day, 30–hour workweek. By virtue of this formula, an account executive could become eligible for a four-day, 30–hour workweek if she had "cash-in" (career sales) of $200,-000 and maintained the monthly target for a franchisor-sponsored incentive vacation trip offered each year. When Anita Kurz devised this formula, she knew that the only OM5 account executive who could meet the eligibility requirements was Spina. Indeed, Anita Kurz purposefully fashioned the formula so that she could accommodate Spina's request.

36. After deciding to grant Spina's request for a four-day, 30–hour workweek and devising this formula, Anita Kurz privately advised Spina that OM5 would allow her to work a reduced schedule. Anita Kurz also advised Spina that Anita would

be announcing the news to the other account executives and presenting it to them as a new policy to which they also could aspire. Spina reacted happily to this news, and Anita then announced the policy to the remainder of the OM5 staff.

37. No employee of MRO or OM5, other than Spina, was ever allowed to work less than a five-day, 37½–hour workweek.

38. Under Spina's new work schedule, Spina worked in the office Mondays through Thursdays and had Fridays off. Thus, Spina worked 30 hours per week, whereas all the other account executives at OM5 (and MRO) worked 37½ hours per week. OM5 continued to allow Spina to work a 30–hour, four-day workweek through the end of her employment.

39. As time passed, Spina's four-day workweek arrangement began to create problems. Although Spina was now working a reduced workweek, she had the poorest attendance record of the OM5 account executives. Because Spina never made up for missed days by coming in on Fridays, she often worked less than four days per week. This heightened the workload of the other OM5 account executives and created a work imbalance because the other OM5 account executives would have to handle placement orders that were being telephoned in on Spina's accounts, but they received no commissions on those orders. In addition, because Spina was out of the office so often, she could not reciprocate for them on their accounts. This situation caused discontent among the OM5 staff, complaints from the OM5 staff and from customers, and the perception of preferential treatment toward Spina.

*Spina's Initial Request for Three–Day Workweek*

40. In the late summer or early fall of 1985, over one year after Spina had begun working a four-day workweek, Spina initiated another conversation with Anita Kurz in the Company training room. During this conversation, Spina advised Anita Kurz that Spina wanted to work a three-day workweek. Spina explained that she did not need to earn as much money as she was then earning (her husband now had a full-time job) and that she wanted to spend more time at home with her child. In response, Anita Kurz told Spina that she already was working a four-day workweek and that it was not possible to allow her to work less than that. Anita Kurz also advised Spina that as it was, when Spina was out of the office, the other account executives were doing her job for her. Spina became upset and said that she was the most tenured person there and felt that she deserved a further reduced workweek. This conversation occurred *before* Spina announced her pregnancy.

41. A few days later, Spina initiated another conversation with Anita Kurz pertaining to this same topic. This time, Spina proposed working two days at the office and two days at home. Anita Kurz refused to accept this proposal as well and accused Spina of being unreasonable and of taking advantage of their friendship. This conversation also occurred *before* Spina announced her pregnancy.

*Spina's Pregnancy*

42. In late September or early October, 1985, Spina's absenteeism began getting worse, and she reported to Anita Kurz that she had an ulcer and was taking medication for it.

43. In mid-October, 1985, Spina announced to Anita Kurz that she was pregnant. This news surprised Anita Kurz because Spina had confided to Anita Kurz earlier in the year that Spina and her husband were having marital problems. After hearing Spina's news, Anita Kurz said to Spina, "That's wonderful. Maybe it'll bring the two of you together again."

44. Spina subsequently mentioned to Anita Kurz Spina's concern that the medication she had been taking for her ulcer might have some adverse effect on her baby. Anita Kurz sought to reassure Spina by recounting that Anita Kurz herself had undergone a battery of tests for a suspected brain tumor, had subsequently learned that she was pregnant at the time she underwent the tests, and that the baby had not been adversely affected. Anita Kurz sought to further reassure Spina by

offering to telephone a friend who was an obstetrician and to seek his opinion. Spina accepted the offer, and Anita Kurz called the obstetrician. The obstetrician advised Anita Kurz that Spina had nothing to worry about. Anita Kurz then relayed this information to Spina, who expressed relief.

*Spina's Renewed Request for a Three-Day Workweek*

45. Not long after announcing her pregnancy, Spina again raised the subject of wanting to work a three-day workweek. This time, Spina telephoned Anita Kurz at the office, claiming that Spina's doctor had recommended that she work part-time. Anita Kurz did not believe Spina and felt that Spina was manipulating Anita into giving Spina what she had been unable to get before. Though Anita Kurz disbelieved Spina's story and told Spina that she could not change her schedule, Anita Kurz also told Spina that if she was sick, she could take time off as she always had done before. Anita Kurz also advised Spina that she could take an extended leave of absence if she so desired. Spina expressed bitterness over Anita Kurz's response and told Anita Kurz that she would be taking an extended leave of absence.

46. For the next several weeks, and until her resignation on November 20, 1985, Spina did not come to work. As had occurred when she had taken extended leaves of absence in the past, however, Spina continued to earn large commissions on her accounts for job orders which were taken over the telephone by Anita Kurz or other OM5 account executives. Indeed, during some of the pay periods preceding her resignation, Spina received more commissions than any other account executive.

47. Meanwhile, during November of 1985, while Spina was out of the office on her extended leave of absence, Anita Kurz visited Spina at Spina's home to see how she was feeling. Anita Kurz also hoped the visit would ease the tension that had arisen between them over Spina's demand for a three-day workweek. Anita Kurz even brought a gift for Spina's daughter.

48. During the visit, Anita Kurz and Spina engaged mostly in "small talk" relat-

ed to how Spina was feeling, and Spina said that she was feeling better. Spina asked Anita Kurz if Spina could work from home on one of her accounts, McLennan–Thebault. Anita Kurz answered that she would handle the account for Spina and that Spina should just concentrate on getting some rest and getting better. (Company records show that Anita Kurz in fact placed an order for Spina on the McLennan–Thebault account during Spina's absence).

49. Within a week or two prior to her resignation, Spina met for lunch with Kimberly Donile Natalino, a former employee of OM5. At the time Spina and Natalino met for lunch, Natalino was employed as the manager at Matthews, Giroux & Associates ("MGA"), a competitor of OM5. When Natalino left OM5 to work for MGA, OM5 sued Natalino for breaching the restrictive covenant in her OM5 employment agreement. During lunch, Spina mentioned her desire to work a reduced schedule to Natalino. Natalino, in turn, told Spina about Natalino's part-time schedule and the part-time schedules of others at MGA.

*Spina's Resignation*

50. On November 20, 1985, Spina telephoned Richard Kurz and demanded a three-day workweek because of her health. Richard Kurz told Spina that she should be talking to her manager, Anita Kurz, but he added that Spina was free, as she had always been, to take whatever time off she needed for health reasons or to continue her leave of absence. Spina insisted, however, that she wanted a permanent three-day workweek, and Richard Kurz responded that that was not possible.

51. On the same day, shortly after her conversation with Richard Kurz, Spina telephoned Anita Kurz. During this conversation, Spina told Anita Kurz that Spina was ready to return to work, but that she wanted to work a permanent three-day workweek and that if Anita Kurz would not permit her to do so, then Spina "had found someone who would" allow her to do so. Anita Kurz refused to accede to Spina's

demand for a permanent three-day work-week and Spina quit.

52. Spina then said that she wanted to pick up her possessions from OM5, and Anita Kurz said that she would call Spina and let her know when it would be convenient to do so. Angered by Anita Kurz's response, Spina told Anita Kurz that she was no longer Spina's boss and could not tell Spina what to do anymore. Spina also told Anita that Spina had a key to the office and that Spina "could clean her out tonight" if she wanted to do so. Although Spina offered a substantially different version of this conversation at trial, we specifically reject her version as incredible. We note that Spina's version of this conversation seemed to become progressively more embellished, as the version related by Spina at trial even contradicted the more innocuous version of this conversation previously related by Spina during her deposition.

53. Following her conversations with Richard and Anita Kurz, Spina wrote a self-serving letter to the Kurzes dated November 20, 1985. In this letter, Spina purported to confirm her version of the events preceding her resignation. The Court assigns no weight to the contents of this letter.

54. On the evening of November 20, 1985, in response to Spina's earlier remarks, Anita and Richard Kurz changed the locks to the office. A few days later, Spina came to retrieve her possessions. While there, Spina, by her own admission, told Anita Kurz to "go to hell" because Spina thought that some of her personal articles which had been placed in a box had been damaged.

55. At or about the time of her resignation, Spina also sent a letter to Richard Giroux, a principal of MGA, informing him that she was looking for a "part-time career opportunity." Spina subsequently obtained a position with MGA working a 24–hour, three-day workweek on a permanent basis. Spina continued to work this schedule until she gave birth to her child. After taking maternity leave for six to seven months, Spina returned to MGA and then worked a fixed, two-day workweek, a schedule she maintained until she left her employment with MGA in October, 1987.

*Spina's Claims of Constructive Discharge*

56. Spina claimed that the Company constructively discharged her because her medical condition prevented her from working a four-day workweek and her financial situation prevented her from continuing her leave of absence. These claims, however, were not borne out by the record.

57. In support of her claim that her pregnancy-related condition rendered her unable to work a four-day workweek, Spina testified that she had an ulcer, that her doctor ordered her to stop taking ulcer medication following her pregnancy, that this caused her intense pain and, that as a result, she could no longer continue to work her normal schedule. These claims are subject to serious question based on the following evidence:

a. Nowhere in the files subpoenaed from Dr. Tcheupdjian, Spina's doctor, is there any reference to Spina having an ulcer or to Spina taking medication for an ulcer. All test results appear negative for an ulcer;

b. The medical files from Dr. Tcheupdjian reflect no treatment being administered to Spina after October 7, 1985, the period during which she claimed that she was suffering intense pain;

c. Spina presented no testimony from her treating physician or any other physician to substantiate her claim that her medical condition rendered her unable to continue to work a four-day workweek.

58. To bolster her claim that her medical condition rendered her unable to work her normal four-day workweek, Spina nevertheless relied heavily on a note from Dr. Tcheupdjian. Even assuming that Spina in fact had an ulcer, however, the note that she obtained from Dr. Tcheupdjian lent no support to her claim that her medical condition rendered her unable to work her normal schedule. First, Spina, by her own admission, never showed this note to the Kurzes. Second, the note is conspicuously dated November 20, 1985, the same date that Spina resigned. Finally, the note

did not state that Spina had to work a three-day schedule, but, instead, merely stated that she could return to work on a "part-time" basis. Spina conceded that she already was working on a part-time basis with her four-day workweek and, in addition, that she always had been allowed to take whatever time she needed for illness or medical reasons. Indeed, Spina even conceded that she was absent so much as a result of illnesses, doctor's appointments, and the like that she already was working less than her normal four-day workweek in many weeks. On its face, therefore, the doctor's note permitted Spina to return to her normal "part-time" workweek anyway.

59. The Court does not believe Spina's assertion that either Anita or Richard Kurz ever told Spina that her only options were to return to working a five-day, 37½ hour workweek or to take an extended leave of absence.

60. Although Spina also claimed that she merely wanted to work a three-day workweek on a *temporary* basis until she felt better, we reject that contention as incredible and inconsistent with the following evidence:

a. Spina's conversation with Anita Kurz on the day she resigned, wherein Spina told Anita Kurz that if she would not allow Spina to work a permanent three-day workweek, then Spina "had found someone else who would" do so, forcefully suggests that Spina either already knew that she had a "part-time" position with MGA or, if she did not, that Spina was confident that she could secure such a position given her sales performance at OM5;

b. Spina stated in her letter to MGA that she was seeking a "part-time career opportunity." Spina not only subsequently obtained a position at MGA working a permanent three-day workweek, but also returned to that position after giving birth to her second child and worked a two-day workweek until she left MGA in October, 1987;

c. The Kurzes steadfastly testified that Spina had never characterized her request for a three-day workweek as temporary.

61. Spina also claimed that she was forced to resign because her financial circumstances required that she continue to work. According to Spina's tax returns in 1985, however, she earned $55,593.31 at OM5, while her husband earned $37,520.39 at his job, for a total of over $93,000.00. The Spinas' joint earnings in 1985 exceeded their joint earnings in 1984 by more than $15,000.00. Both Spina and her husband testified that their taxable income for 1985 was higher than it had been in any other year during their marriage. Furthermore, Spina continued to receive sizable commissions throughout her leave of absence in October–November, 1985, as Anita Kurz and other OM5 account executives took placement orders for Spina on her accounts. Spina offered no reason for the Court to believe that this arrangement would not have continued had she remained on leave rather than quit.

62. Spina contended that notwithstanding these earnings, her expenses prevented her from continuing her leave. Yet, aside from a monthly mortgage payment of $1,100.00 on her house, Spina was unable to specify what those expenses were. Her 1985 tax return provided some insight: she paid $2,956.00 in general sales taxes, which meant that she and her husband spent over $42,000.00 on consumer items that year ($2,956.00 ÷ 7% Illinois sales tax). Spina and her husband also owned three vehicles during 1985, each of which was being financed through loans. Nevertheless, despite a combined income of over $93,000, Spina and her husband earned only $188.00 in interest income that year.

63. In contrast to the Spinas' joint earnings in 1985, their joint taxable income in 1982 was $0. Yet, in May, 1982, Spina voluntarily chose to quit her job and raise her child rather than take a leave of absence, and she was able to remain out of work for ten months. It is anomalous that she could afford to voluntarily quit her job on a zero taxable income in 1982, but could not afford to take even a temporary leave of absence on a $93,000 income in 1985.

64. Furthermore, despite Spina's claim that she needed "every penny she could

get" when she allegedly was "forced out" of OM5, Spina could offer no explanation for her failure to apply for unemployment compensation benefits.

65. Based on the foregoing facts and figures, the Court finds that Spina's financial circumstances were not such that she was forced to quit her job with OM5 in 1985. Even assuming that Spina was not physically well enough to come to work, she had ample income to afford to continue her medical leave as an alternative to resigning. Moreover, even if Spina had significant expenses, these expenses were attributable to her high-spending lifestyle, which she easily could have changed by simply curtailing her lavish spending on consumer items. Indeed, Spina's financial circumstances were not created by the Kurzes; they were created by Spina.

66. Spina also had alternatives to resigning that she failed to explore. For example, Spina could have asked the Company for an advance on her draw. Richard Kurz testified that given Spina's production, the Company likely would have given her such an advance.

67. The Court rejects as particularly unworthy of belief Spina's claim that Anita Kurz enlisted all of the OM5 employees to act coldly toward Spina and to not congratulate her on her pregnancy, as well as Spina's claim that Anita Kurz suggested an abortion to Spina after she announced her pregnancy. These claims are entirely inconsistent with Anita Kurz's admitted and repeated gestures of kindness and concern toward Spina both before and after she announced her pregnancy. To the extent that Spina chose to misinterpret any of these gestures, her interpretations were unreasonable.

68. The Court also rejects Spina's interpretation of the handling of the Gorman and McLennan & Thebault accounts. In this Court's view, neither of these incidents, nor any of the other incidents cited by Spina, could reasonably be interpreted as evidence that the Company discriminated against Spina because of her sex and/or pregnancy.

69. Notably, all of the former MRO or OM5 employees who testified at trial (including Sandra Creagan, who herself became pregnant while at OM5) asserted that they had never seen any evidence that the Kurzes discriminated against pregnant employees.

70. This Court specifically finds that Spina voluntarily resigned because Anita Kurz would not accede to Spina's unreasonable demand for a permanent three-day workweek. The Court further finds that Spina attempted to take advantage of her position as OM5's top producer, as well as her close personal relationship with Anita Kurz, to manipulate Anita Kurz into giving Spina whatever she wanted. When Anita Kurz refused to bow to such pressure, Spina voluntarily quit and chose to characterize her resignation as a "constructive discharge." Spina was not discharged, constructively or otherwise.

*Spina's Claims of Disparate Treatment*

71. Spina also contended that MRO treated two of its male employees, Douglas Stahle ("Stahle") and Dean Hawley ("Hawley"), more favorably than Spina because MRO allowed them to work reduced schedules when they were having medical problems.

72. As MRO employees, however, Stahle and Hawley were not similarly situated to Spina. Stahle and Hawley worked in the MRO division, whereas Spina worked in the OM5 division. As noted above, MRO and OM5 were physically separate, as well as separately operated, supervised, and administered. The employees of the two divisions performed entirely different types of placement work, there was no line of progression and no professional interchange between the MRO and OM5 employees, the employees of the two divisions never interfaced in performing their respective duties, and the positions in each division required different qualifications and levels of skill.

73. Spina attempted to justify a comparison between herself, on the one hand, and Stahle and Hawley, on the other hand, based on the common ownership of the two divisions, their lack of separate incorporation, and the integration of their payroll

and benefits functions. These similarities, however, pale in comparison to the differences previously noted. The Court accepts Richard Kurz's testimony that these common features resulted from a desire for administrative convenience and to conserve costs and not from a desire to treat the divisions as the same entity.

74. Douglas Stahle was employed as an account executive at MRO from May 1, 1978 until May 15, 1982. On April 4, 1980 he took a medical leave of absence to have hip replacement surgery. He returned on May 19, 1980. On August 3, 1981 he took another medical leave of absence to have replacement surgery for his other hip. He returned on September 14, 1981.[1] During these leaves of absence, Stahle received no compensation other than commissions due him. In addition, although Stahle was covered under the MRO health insurance plan, Stahle paid for his own medical insurance either by personal check or by payroll deduction throughout his employment.

75. Spina produced several former MRO and OM5 employees to testify to their observations regarding Stahle's attendance before and after these leaves. All or most testified that prior to each surgery, Stahle missed a few days to prepare for the surgery, and that after each surgery, Stahle went home early once or twice a week for therapy over a four- to six-week period. Most of the witnesses also testified that Stahle routinely would leave at 4:00 p.m. on several days during the week for therapy.

76. All of the witnesses, however, conceded that they did not know when Stahle arrived in the morning, and each conceded that he may have come in early. Further, none of the witnesses knew whether Stahle took a full lunch or a half-hour lunch, or whether he worked on Saturdays. According to Jeffrey Rogers, a former MRO employee, Stahle's attendance was good and he came to work every day of the workweek even during his post-operative recovery periods.

77. Richard Kurz testified that Stahle in fact did come in early every morning at 7:30 a.m. or 8:00 a.m. and that Stahle had a key to the office and often opened up the office and made the coffee. Virtually every witness except Spina corroborated this testimony. Kurz also testified that Stahle made up for time he missed due to his therapy sessions and managed to work 37½ hours every week. This testimony was uncontroverted. Every single witness called by Spina conceded that as far as he or she knew, Stahle could have worked a full 37½–hour workweek both before and after his surgeries.

78. While MRO no longer had timesheets covering the period of Stahle's leaves (Kurz testified that he routinely threw out the older timesheets), MRO still had Stahle's payroll records for 1980 and 1981. According to Stahle's 1980 payroll ledger, Stahle in fact worked full 37½ hour workweeks during the period following his return from his first surgery. Although Stahle's 1981 payroll ledger does not show the actual hours Stahle worked following his return from his second surgery, it fairly may be inferred that he also worked full workweeks then, too, as evidenced by (a) the acknowledgment by all witnesses that Stahle's work pattern was the same after both surgeries; and (b) the payroll ledger's indication that Stahle was receiving his full draw following his return from the second surgery.

79. Dean Hawley also was employed as an account executive at MRO from November, 1985 until May, 1986. Hawley's employment overlapped with Spina's for only one month. Because Spina was on leave of absence for most of that month, neither she nor Hawley knew one another while employees. Hawley elected not to receive a draw after December, 1985 because he did not like the idea of owing the Company money. In addition, he carried and paid for his own medical insurance, so he was not covered under the MRO health insurance plan.

80. Beginning in April, 1986, approximately six months after Spina's resignation, Hawley began missing several days because of problems with ulcers and his

---

1. Stahle left MRO in 1982 and died sometime     thereafter.

throat. Hawley and Richard Kurz testified that these absences were haphazard and not arranged in advance. Each also testified that Hawley's schedule remained that of a full-time employee; he simply missed days here and there for medical reasons. This testimony was uncontroverted, and Spina presented no evidence that Hawley ever asked for or received a reduced work schedule.

81. Like Stahle and Hawley, Spina always was given the option of leaving work if she was not feeling well. Spina herself admitted that she missed work from time to time because of her medical problems even after she announced her pregnancy. Thus, even if Stahle and Hawley were similarly situated employees, neither of them was treated more favorably than Spina.

82. Indeed, the record reveals that if any employee at OM5 or MRO received preferential treatment, it was Spina.

83. Spina also attempted to argue that she was victim of disparate treatment because the Company ceased paying her medical insurance premiums and her draw during her period of medical leave. The evidence revealed, however, that Spina was the only employee whose medical insurance was ever paid for by the Company. In contrast, all other MRO and OM5 employees, including Stahle and Hawley, had always either paid for their medical insurance by payroll deduction or carried their own separate policies whether or not they took a medical leave of absence.

84. Although Spina also testified that she complained to Richard Kurz in October or November of 1985 that her draw against commissions was stopped during her leave of absence, the Company's payroll ledger for that time period indicated that Spina received commissions far in excess of her guaranteed draw. Spina therefore would have had no reason to complain about not receiving a draw, confirming Richard Kurz's testimony that no such conversation ever occurred.

85. The evidence similarly failed to support Spina's claim that the Company had paid a draw to Stahle during his previous medical leaves of absence. In fact, in anticipation of taking leave, Stahle had asked Richard Kurz to spread out over time the commissions already earned by Stahle so that he would continue to receive a check while on medical leave.

86. Finally, Spina attempted to raise an inference that females at OM5 were generally treated less favorably than males at MRO because of certain differences between the OM5 and MRO divisions. For example, Spina elicited testimony that Richard Kurz had a large office while Anita Kurz did not and that MRO occupied a larger share of the Company office space than OM5. These differences, however, are innocuous. Spina also elicited testimony that only MRO account executives received reimbursement for business-related automobile expenses and extraordinary telephone expenses and an expense account for business lunches. This difference in treatment, however, was justified by the business differences between the two divisions already outlined. Moreover, these benefits were not extended merely to male MRO account executives; female MRO account executives enjoyed these benefits as well.

*Credibility Findings*

87. During the course of the trial, this Court has had the unique opportunity to observe the demeanor of the witnesses while testifying to the events giving rise to this dispute and to weigh the credibility of those witnesses. Based on our observations, we make the following credibility determinations:

a. Spina's testimony on all disputed issues of fact was embellished, often contradictory, inconsistent, evasive, and not credible. She often lacked recollection of details when full recollection would damage her interests and volunteered information when full recollection would serve her interests. Throughout her entire examination, she had to be repeatedly admonished to provide direct answers to the questions posed to her, and during cross-examination, she was consistently impeached. For the record, we offer but a few examples:

(i) At trial, Spina testified for the first time that she was treated unfairly and

unequally by Richard and Anita Kurz after she announced her *first* pregnancy in 1981. In her prior deposition, however, she stated that she did *not* believe she was treated unfairly or unequally during her first pregnancy. This latter admission, together with the uncontroverted testimony that Spina voluntarily returned to work at OM5 following the birth of her first child, renders Spina's trial testimony implausible. If Spina believed that the Kurzes had discriminated against her during her first pregnancy, it makes no sense that Spina would then seek to return to work for those same individuals following her first pregnancy.

(ii) In her trial testimony, Spina stated that when Anita Kurz visited her at her home in November, 1985 to talk about the McLennan–Thebault account, Anita Kurz told Spina that Anita had been receiving complaints about Spina's four-day workweek. According to Spina, Anita Kurz wanted Spina to revert to a five-day workweek or to continue her leave. In her deposition, however, Spina testified that Anita Kurz wanted Spina to return to the office and work "four days a week" or, in the alternative, to take a leave of absence.

(iii) At trial, Spina testified that she was always able to get a lot of her work done on Fridays, her day off. In fact, Spina claimed that some of her most productive days were on Fridays. Spina further testified that when she was in the hospital or out sick, Anita Kurz would bring work to her and require that she do her work from home or from the hospital. Yet, Spina's weekly activity sheets, in which she recorded on a weekly basis the number and types of search calls she made, revealed that she rarely worked on Fridays and did not work at all whenever she was in the hospital or out sick.

b. Anita Kurz, the manager of OM5, testified as an adverse witness during Spina's case-in-chief and as a witness during the Company's case-in-chief. Her testimony on all disputed issues of fact was forthright, knowledgeable, clear, sincere, consistent, and entirely credible.

c. Richard Kurz, the president and manager of MRO, also testified as an adverse witness during Spina's case-in-chief and as a witness during the Company's case-in-chief. His testimony on all disputed issues of fact was straightforward, knowledgeable, detailed, and entirely credible. For the record, in two particular instances, Spina's counsel attempted to impeach Richard Kurz and we feel constrained to resolve what Spina's counsel apparently viewed to be serious conflicts on these issues:

(i) First, Spina's counsel attempted to impeach Richard Kurz's testimony during direct examination that Spina had requested a permanent three-day workweek before she announced her pregnancy. Spina's counsel attempted to impeach this testimony with an affidavit made by Richard Kurz in the Company's lawsuit against Spina for breaching her restrictive covenant. In that affidavit, Richard Kurz stated that "[b]eginning in November, 1985, Spina requested that she be allowed to work three days per week." (Affidavit of Richard Kurz in Support of Motion for Temporary Restraining Order and Preliminary Injunction at ¶ 14). Spina's counsel ostensibly introduced this affidavit to show that it contradicted Richard Kurz's trial testimony that Spina had requested the three-day workweek prior to her pregnancy. We note, however, that November, 1985 *was* the first time that Spina had asked *Richard* Kurz for permission to work a three-day week. Spina's previous requests, both before and after announcing her pregnancy, had been addressed to *Anita* Kurz. Thus, Richard Kurz's trial testimony on this point did not necessarily conflict with his prior affidavit.

(ii) Second, Spina's counsel also attempted to insinuate that Richard Kurz had altered a certain payroll ledger pertaining to Douglas Stahle (Ex. 98) because Kurz had made certain handwritten notations on it before producing it to the Company's attorneys. The Company's attorneys, in turn, produced the document to Spina's attorneys during the course of discovery. Spina's counsel at-

tempted to impeach Richard Kurz's credibility by introducing a copy of the same payroll ledger without the notations, which had been produced by the Company to the Illinois Department of Human Rights ("IDHR") during the course of its administrative investigation. While Richard Kurz may have exercised poor judgment by making handwritten notations on a document to be produced during discovery, this Court does not believe that he intentionally altered this document or intended to mislead either Spina or the Court. If Richard Kurz had truly intended to "alter" this document, he undoubtedly would have made the same notations on the critical copy produced to the IDHR. This Court believes that he merely intended to call certain matters to the attention of the Company's counsel.

d. Richard Jackson, called by Spina to testify as a witness during her case-in-chief, is a former employee of MRO. Jackson worked for MRO between 1978 and 1986. By his own admission, his recollection of the events about which he was questioned was "fuzzy." Although his demeanor while testifying was sincere and truthful, his knowledge of disputed issues of fact was rather limited in scope. While generally credible, his testimony lent no credence to Spina's version of the disputed issues of fact. On the contrary, he testified that he never saw any evidence that the Kurzes discriminated against women generally or against pregnant women during the eight-year period that he worked at MRO.

e. Kimberly Donile Natalino, called by Spina to testify as a witness during her case-in-chief, is a former employee of OM5, a former co-worker of Spina's at OM5, and a friend of Spina's. Natalino worked at OM5 from March, 1980 until October, 1983. When Natalino left OM5, she, like Spina, was sued by OM5 for breaching her restrictive covenant. Her testimony on all disputed issues of fact was significantly biased in favor of Spina and prejudiced against the Company. In spite of this, Natalino candidly admitted that Douglas Stahle usually arrived at the office before

she did, that her knowledge of Douglas Stahle's work schedule was limited, and that she never saw any instances of discrimination by the Kurzes against pregnant women while employed by OM5. To that extent, her testimony was partially credible.

f. Ernest Spina, called by Spina to testify as a witness during her case-in-chief, is Spina's ex-husband. Although the record is unclear as to when or how long Vicki and Ernest Spina were married, the record clearly indicates that they were married during those years relevant to this lawsuit. Ernest Spina's testimony on all critical issues of disputed fact was limited in scope, not very knowledgeable, and, therefore, not very credible. He admitted that he derived most of his information concerning Spina's situation and medical condition from Spina herself and, to that extent, his testimony on those issues was significantly biased, unreliable, and not credible. Frankly, Ernest Spina's testimony that Vicki Spina was "constantly sick" after she became pregnant, that she "quit" OM5, and that their joint income in 1985 was higher than any previous year in their marriage damaged Spina's case more than helping it.

g. Sandra Creagan, called by Spina to testify as a witness during her case-in-chief, is a former employee of OM5 and a former co-worker of Spina's at OM5. Creagan worked at OM5 from January, 1979 until October, 1981, when she left to give birth to her child. Although her demeanor while testifying was sincere and truthful, her recollection of events which occurred during her employ was admittedly sketchy and her testimony was rather limited in scope. Again, while generally credible, her testimony lent no credence to Spina's version of the disputed issues of fact. Significantly, though she left OM5 in her seventh month of pregnancy, she unequivocally testified that she neither witnessed any discrimination by the Kurzes against pregnant women, nor experienced any such discrimination against her as a result of her own pregnancy.

h. Dean Hawley worked at MRO from November, 1985 until May, 1986. Portions

of Hawley's deposition were read into evidence by both parties. Though the Court therefore did not have the opportunity to observe Hawley's demeanor while testifying, we note that Hawley categorically disputed Spina's version of a telephone conversation that she initiated between herself and Hawley. We find it noteworthy that Hawley, unlike Spina, was a disinterested party with no motive to lie. Hawley's testimony only further undermined Spina's credibility and discredited her version of the events.

i. Jeffrey Rogers, called by Spina to testify as a witness during her case-in-chief, is a former employee of MRO. Rogers worked at MRO from February, 1980 until January, 1985. Although his demeanor while testifying was sincere and truthful, and he testified that his memory was clear, his knowledge of disputed issues of fact also was rather limited in scope. While generally credible, his testimony lent no credence to Spina's version of the disputed facts and, in fact, tended to support the Kurzes' version of the disputed facts.

j. On all disputed issues of fact, we specifically find that the Kurzes' version of the events was worthy of credence and that Spina's version of the events was unworthy of credence.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a).

2. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) and (c).

3. This action is brought under Title VII of the Civil Rights Act of 1964, as amended ("Title VII" or "the Act"), 42 U.S.C. § 2000e *et seq.* Section 703 of the Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). Section 701(k) of the Act provides that the term "because of sex" includes, but is not limited to, "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work...." 42 U.S.C. § 2000e(k).

4. Spina timely filed a charge of discrimination against the Company with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights and received a notice of her right to sue from the EEOC, as required by Section 706 of the Act. 42 U.S.C. § 2000e–5.

5. The Company is an employer within the meaning of Section 701(b) of the Act. 42 U.S.C. § 2000e(b).

6. In order to prevail on a claim of sex and/or pregnancy discrimination under Title VII, a plaintiff must ultimately establish that she was a victim of intentional discrimination. *See United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). In other words, a plaintiff must establish that her employer treated her less favorably than other employees because of her sex and/or pregnancy.

7. A Title VII plaintiff may prove her case by direct or indirect evidence. *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568–69 (7th Cir.1989).

8. This circuit has defined direct evidence as evidence which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle,* 876 F.2d at 569. In this case, Spina produced no credible direct evidence of sexual and/or pregnancy discrimination.

9. A Title VII plaintiff may also establish sex and/or pregnancy discrimination by the indirect method of proof outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *McDonnell Douglas* and *Burdine* established a three-step framework for analyzing employment discrimination claims, setting forth the rules governing the burden of proof, the burdens of production, and the order of proof. According to that framework, the plaintiff must first establish a prima facie case by offering evidence adequate to raise an inference that she was the victim of an adverse employment decision because of her sex and/or pregnancy. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If the plaintiff succeeds, then only the burden of production shifts to the employer to "articulate a legitimate, non-discriminatory reason" for its action. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. If the employer meets this burden of production, then the employee must demonstrate that the employer's articulated reason is a mere pretext. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95. Plaintiff retains the burden of proof throughout this process. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

10. This circuit has repeatedly noted that "[t]he elements of a prima facie case of sex discrimination when the plaintiff alleges that employees of one sex are discriminately denied a benefit that is extended to employees of the opposite sex is unsettled." *Scherr v. Woodland School Community Consolidated District No. 50,* 867 F.2d 974, 983 n. 6 (7th Cir.1988); *Beard v. Whitley County REMC,* 840 F.2d 405, 411 (7th Cir.1988); *Jennings v. Tinley Park Community Consolidated School District No. 146,* 796 F.2d 962, 965 (7th Cir.1986) *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987). In the absence of guidance from the Supreme Court on the issue, however, this circuit has assumed, without holding, that in order to establish a prima facie case of sex and/or pregnancy discrimination, a plaintiff need only show a difference in treatment between two major groups of employ-

ees of different sex. *Scherr,* 867 F.2d at 982 n. 6; *Beard,* 840 F.2d at 411.

■ 11. Spina failed to present credible evidence that she was treated less favorably than similarly situated male or non-pregnant employees.

12. Spina failed to establish that Stahle and Hawley, who had different qualifications and worked in a different division under a different supervisor, were similarly situated to Spina. *See Jardien v. Winston Network, Inc.,* 888 F.2d 1151, 1156 (7th Cir.1989) (holding testimony regarding employees who worked in different divisions of employer than plaintiff to be irrelevant); *EEOC v. Clay County Rural Telephone, Inc.,* 694 F.Supp. 563, 574 (S.D.Ind.1988). *See also Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531, 1546 (S.D.N.Y.1986), *affirmed* 814 F.2d 653 (2nd Cir.1987); *Donohue v. Custom Management Corp.,* 634 F.Supp. 1190, 1195 (W.D. Pa.1986). Moreover, even assuming that Stahle and Hawley were similarly situated males, Spina failed to prove that either of them was in fact treated more favorably than Spina.

13. The Court also notes that it seriously doubts that the evidence presented regarding Hawley's circumstances are relevant to this case, as Hawley's alleged favorable treatment occurred four to five months *after* Spina's departure from OM5. *See Jardien,* 888 F.2d at 1156; *Johnson v. Yellow Freight Systems, Inc.,* 734 F.2d 1304, 1310, (8th Cir.), *cert. denied,* 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984); *Crimm v. Missouri P.R. Co.,* 750 F.2d 703, 708, (8th Cir.1984). These doubts are heightened by Spina's inability to prove disparate treatment vis-a-vis Stahle, the only male whom Spina alleges received favorable treatment *prior* to her departure.

■ 14. Spina also failed to adduce credible evidence that she was constructively discharged. This circuit has repeatedly held that a constructive discharge occurs only when an employer " '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Bartman v. Allis*

*Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987) (citations omitted) (emphasis in *Bartman* ); *see also Weihaupt v. American Medical Association,* 874 F.2d 419, 426 (7th Cir.1989); *Henn v. National Geographic Society,* 819 F.2d 824, 829 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). An employer, however, is "not obligated to rescue [an employee] from a predicament for which it was not responsible." *Bartman,* 799 F.2d at 315.

15. Accordingly, Spina failed to establish a prima facie case of sex and/or pregnancy discrimination.

■ 16. Even if this Court were to assume that Spina had produced sufficient, credible evidence to establish a prima facie case of sex and/or pregnancy discrimination, the Company easily met its burden of producing evidence that it refused to allow Spina to work a part-time schedule or three-day workweek for a legitimate, non-discriminatory reason.

17. To the extent that Spina relied on the evidence relating to Stahle and Hawley to establish that OM5's articulated reason for denying her demand to work a three-day workweek was a pretext for discrimination, she failed to carry her burden of proving that OM5's articulated reason was pretextual for the same reasons outlined above. Spina also failed to present any other credible evidence of pretext.

18. The credibility of witnesses is often crucial in evaluating employment discrimination cases. *See Jardien,* 888 F.2d at 1155; *Christie v. Foremost Ins. Co.,* 785 F.2d 584, 586 (7th Cir.1986).

19. Spina failed to carry her ultimate burden of persuading this Court that she was the victim of intentional sex and/or pregnancy discrimination.

20. As a matter of law, this Court concludes that the Company did not discriminate against Spina because of her sex and/or pregnancy and, therefore, that the Company did not violate the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

DECISION

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court enters judgment in favor of the defendant, Management Recruiters of O'Hare, d/b/a Office-Mates 5, and against the plaintiff, Vicki L. Spina. Because the defendant has prevailed on the issue of liability, there will be no need for the Court to consider the issue of the plaintiff's damages. In addition, this decision renders moot the defendant's motion for judgment after the plaintiff's case.